**Eurus Kelly WATERS,**
**Plaintiff–Appellee,**

v.

**Ralph KEMP, Warden, Georgia Diagnostic and Classification Center, Defendant–Appellant.**

No. 86–8889.

United States Court of Appeals,
Eleventh Circuit.

April 29, 1988.

---

Paula K. Smith, Asst. Atty. Gen. of Ga., William B. Hill, Jr., Asst. Atty. Gen., Atlanta, Ga., for defendant-appellant.

James M. Doyle, Georgetown University of Law Center, Washington, D.C., Lee Mundell, II, Leonard J. Panzitta, Wade W. Herring, II, Hunter, Maclean, Exley, & Dunn, P.C., Savannah, Ga., George Kendall, Atlanta, Ga., for plaintiff-appellee.

Before TJOFLAT, HATCHETT and CLARK, Circuit Judges.

TJOFLAT, Circuit Judge:

Petitioner is a Georgia prison inmate, having been convicted of two counts of murder and sentenced to death in January 1980. Proceeding in forma pauperis, he seeks a writ of habeas corpus nullifying his convictions and death sentences on several constitutional grounds. None of these grounds is pertinent to this interlocutory appeal, which respondent, the warden at petitioner's prison, has taken pursuant to 28 U.S.C. § 1292(b) (Supp. II 1984).[1] The only question before us is whether, as a matter of law, the canons of ethics governing attorney conduct in the United States District Court for the Southern District of Georgia preclude two court-appointed lawyers from representing petitioner because one of their partners happens to be a special assistant attorney general of Georgia.[2] We answer the question in the negative.

I.

Petitioner's application for habeas corpus relief was brought by an attorney associated with the Georgetown University Law School Criminal Justice Center, James Doyle, who is not a member of the Georgia bar and consequently has not been admitted to practice before the district court. Given this circumstance, the district court's local rules required him to associate local counsel. Because petitioner is indigent, Doyle requested the district court to appoint local counsel. The court granted Doyle's request and appointed Lee Mundell and Leonard Panzitta, partners of the Savannah, Georgia law firm of Hunter, Maclean, Exley & Dunn, P.C. (Hunter–Maclean), to assist Doyle in representing petitioner.

Five weeks later, respondent's counsel, the Attorney General of Georgia, ques-

---

1. Section 1292(b) provides in part:

   When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order....

   As stated in the text following this note, the order we now consider pursuant to section 1292(b) is the district court's order denying respondent's motion for the disqualification of petitioner's court-appointed attorneys. *See Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 378 n. 13, 101 S.Ct. 669, 676 n. 13, 66 L.Ed.2d 571 (1981) (indicating that district court's denial of motion to disqualify is appealable pursuant to section 1292(b)).

2. The office of special assistant attorney general is created by Ga. Code Ann. § 45–15–30 (Supp. 1987), which provides, in pertinent part:

   There is created a Department of Law with the Attorney General at the head thereof and with such numbers of deputy attorneys general, assistant attorneys general, *special assistant attorneys general*, other attorneys, paraprofessional personnel, and other employees or independent contractors as the Attorney General shall deem necessary to carry out the functions of the Attorney General and the Department of Law. The Attorney General is authorized to determine the title and to change the title of any attorney or other employee of the Department of Law or any attorney at law under independent contract to the Department of Law in order to define the duties and responsibilities of any attorney or other employee of the said department and to establish salaries and effect promotions of any such attorney or other employee of the said department.

   (Emphasis added.)

tioned the propriety of the appointment. In a "Motion to Disqualify Appointed Counsel," he advised the court that one of his special assistant attorneys general, Robert Glenn, was a partner of the Hunter–Maclean firm, and he suggested that an actual conflict of interest [3] and also an appearance of impropriety would be created if Glenn's partners were permitted to represent petitioner in this case.[4]

The court disagreed, and denied the motion. As the court noted, Glenn's appointment as special assistant attorney general calls for Glenn to represent the Georgia Ports Authority on a case basis, when the Authority's regular counsel is unable to do so.[5] The Authority is a state agency whose charter is, in part, "[t]o acquire, construct, equip, maintain, develop, and improve [the state's] harbors or seaports and their port facilities," Ga. Code Ann. § 52–2–9(17) (1982), and "[t]o foster and stimulate the shipment of freight and commerce through such ports," *id.*

§ 52–2–9–(18). Glenn's duties as special assistant attorney general do not include the representation of respondent or any other official in Georgia's criminal justice system in any matter, including habeas corpus proceedings in federal court. The district court therefore concluded that an actual conflict of interest did not exist, and, moreover, that the representation of petitioner by Glenn's partners would not create an appearance of impropriety.

After the court entered its order denying respondent's motion to disqualify counsel, the attorney general requested the court to amend the order so as to render it immediately appealable under 28 U.S.C. § 1292(b) (Supp. II 1984). He intimated that the question of whether a partner, or an associate, of a special assistant attorney general can ethically accept a court appointment to represent an indigent petitioner in a federal habeas corpus proceeding would be raised every time the court appointed such a partner or associate to represent a death row

---

3. Normally, when one attorney in a law firm is disqualified due to a conflict of interest, the entire firm is disqualified under the doctrine of "imputed disqualification." *See* Model Rules of Professional Conduct Rule 1.10 (1983). Thus, if Glenn is barred from representing petitioner, all other attorneys at Hunter–Maclean are barred.

4. The attorney general based his motion on 1984 Op.Atty Gen.Ga. 244 (hereinafter "U84–27"), an unofficial opinion issued by his office soon after the Georgia legislature amended Ga. Code Ann. § 45–15–30 (1982 & Supp.1984) to include the italicized language recited below:

Attorneys at law under independent contract to the Department of Law may engage in the private practice of law even though they may have been appointed or designated [as special assistant attorneys general]. *Notwithstanding that any attorney at law under independent contract to the Department of Law has been appointed or designated [as a special assistant attorney general] and thus is identified with the State of Georgia as its representative for cases arising within the scope of that appointment or designation, representation of a defendant in criminal proceedings by that assistant attorney general shall not constitute a conflict of interest if [the disclosure requirements of this section are complied with].* (Emphasis added.)

In U84–27, the attorney general declared that special assistant attorneys general cannot represent criminal defendants in any case in which the state seeks the death penalty. The attorney

general now reads U84–27 to preclude special assistant attorneys general and members of their law firms from representing, on court appointment, Georgia death row inmates in federal habeas corpus proceedings.

5. The attorney general's administrative order, dated February 13, 1984, appointing Glenn as a special assistant attorney general, effective March 1, 1984, is reproduced below:

BY THE ATTORNEY GENERAL:

ORDERED: That under the authority contained in Ga. Laws 1966, p. 43, as amended by Ga. Laws 1971, p. 98, and Ga. Laws 1975, p. 1184, the Honorable Robert S. Glenn, Jr., of Savannah, Chatham County, Georgia, be and he is hereby appointed Special Assistant Attorney General to assist the Attorney General and his staff by performing temporary, specific and assigned legal services on behalf of the Georgia Ports Authority and to be compensated for the performance of such legal services by either a flat fee to be established by the Attorney General or at the rate of Sixty Dollars ($60.00) per hour for both in office legal work and out of office legal work, and be it further

ORDERED: That reimbursement to the State Department of Law by the Georgia Ports Authority for expenses incurred and services performed under this appointment shall be made in accordance with the Act approved March 18, 1971 (Ga. Laws 1971, p. 98), as amended by the Act approved April 24, 1975 (Ga. Laws 1975, p. 1184).

inmate, and that immediate appellate resolution of the question would materially enhance the administration of justice in the district courts. In response to this intimation, the court amended its order and made the findings required for an interlocutory appeal under section 1292(b).[6] Respondent thereafter sought leave to appeal, and we granted his application.[7]

## II.

■■■ "A lawyer is a representative of clients, an officer of the legal system and a public citizen having a special responsibility for the quality of justice." Model Rules of Professional Conduct, preamble (1984). As an officer of the court, a lawyer has a fundamental duty to perform services pro bono for indigents when called upon by the court. *See Powell v. Alabama,* 287 U.S. 45, 73, 53 S.Ct. 55, 65, 77 L.Ed. 158 (1932) ("Attorneys are officers of the court, and are bound to render service when required by such an appointment."); *United States v. Dillon,* 346 F.2d 633, 635 (9th Cir.1965) ("An applicant for admission to practice law may justly be deemed to be aware of the traditions of the profession which he is joining, and to know that one of these traditions is that a lawyer is an officer of the court obligated to represent indigents for little or no compensation upon court order."), *cert. denied,* 382 U.S. 978, 86 S.Ct. 550, 15 L.Ed.2d 469 (1966).[8] Moreover, an

attorney must represent an indigent client as professionally and zealously as he represents a paying client.

■■■ An attorney may be relieved of his duty to accept a court appointment only when the appointment is likely to impede the due administration of justice. Thus, for example, the attorney may be relieved of his duty if his representation of the indigent will create a conflict of interest or an appearance of impropriety. In this case, respondent suggests that the Hunter–Maclean partners' representation of petitioner will create either a conflict of interest or an appearance of impropriety. We disagree.

## A.

■■■ A conflict of interest, as defined by the American Bar Association Model Rules of Professional Conduct (Model Rules), which governs the professional conduct of attorneys practicing before the United States District Court for the Southern District of Georgia,[9] occurs when "the representation of [one] client will be directly adverse to another client [or] may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests." Model Rule 1.7.[10] Applying this standard, we find no conflict of interest here.

---

**6.** The district court stayed further proceedings in this case pending the outcome of this appeal.

**7.** *See supra* note 1.

**8.** We recognize that the lawyer's "duty to represent indigents" has been described primarily in criminal cases, such as the ones cited in the text, in which the defendant has exercised his constitutional right to the effective assistance of counsel. Although a federal habeas petitioner does not enjoy this right, because a habeas corpus proceeding is a civil action, *Johnson v. Avery,* 393 U.S. 483, 488, 89 S.Ct. 747, 750, 21 L.Ed.2d 718 (1969); *Hooks v. Wainwright,* 775 F.2d 1433, 1438 (11th Cir.1985), *cert. denied,* — U.S. —, 107 S.Ct. 313, 93 L.Ed.2d 287 (1986), lawyers have traditionally afforded habeas petitioners pro bono representation at the request of the court.

**9.** The district court's local rules provide that "[t]he standards of conduct of the members of the bar of this Court shall include the current

canons of professional ethics of the American Bar Association." S.D.Ga. R. 5(d). The current canons of professional ethics of the American Bar Association (ABA) are contained in the ABA Model Rules of Professional Conduct (Model Rules), which replaced the ABA Model Code of Professional Responsibility (Model Code) in August 1983.

**10.** Model Rule 1.7 provides:
> (a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
> > (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
> > (2) each client consents after consultation.
> (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

Respondent's argument that the court-appointed attorneys' representation of petitioner has created a conflict of interest proceeds as follows. Robert Glenn, as special assistant attorney general, is a member of the attorney general's "law firm," the Georgia Department of Law. Glenn cannot represent petitioner in this case because the attorney general represents respondent; Model Rule 1.7(a) precludes one member of a law firm from representing a party if the representation of that party "will be directly adverse" to one of the firm's existing clients. Nor can Glenn's partners and associates at Hunter–Maclean represent petitioner; they are precluded from representing petitioner because they cannot represent a party whom Glenn cannot ethically represent. As Model Rule 1.10(a) states, "while lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rule[ ] 1.7." Practicing alone, Glenn could not represent petitioner, because Glenn is an assistant attorney general; *ergo*, none of his partners and associates at Hunter–Maclean may represent petitioner.

The *sine qua non* of the respondent's argument is the assumption that Glenn is a member of the law firm that represents respondent. As the record makes clear, this assumption is false.

The Georgia Department of Law consists of "the Attorney General . : . and ... such numbers of deputy attorneys general, assistant attorneys general, special assistant attorneys general, other attorneys, para-professional personnel, and other employees or independent contractors as the Attorney General shall deem necessary to carry out the functions of the Attorney General and the Department of Law." Ga. Code Ann. § 45–15–30 (Supp.1987). Glenn joined the Department of Law on March 1, 1984, when the attorney general appointed him special assistant attorney general. For a fee of sixty dollars an hour, Glenn

agreed "to assist the Attorney General and his staff by performing temporary, specific and assigned legal services on behalf of the Georgia Ports Authority." At the same time, however, Glenn retained the right, under Georgia law, to continue his law practice, as before.

Georgia law provides that lawyers, such as Glenn, under independent contract to provide services for the Department of Law, are permitted to "engage in the private practice of law even though they may have been appointed [a special assistant attorney general]," *id.*, and, moreover, even though they may be required in the interests of their client to oppose the attorney general, as when representing the defendant in a state criminal proceeding. *Id.* Although section 45–15–30 is silent on the point, we assume that if an independent contractor such as Glenn can represent an accused in state court, he can also represent him in federal court, in a proceeding challenging the validity of his conviction.

In sum, Glenn's membership in and obligation to the attorney general's law firm is extremely limited. The only restriction on his right to practice law is that he cannot represent a client if to do so would somehow impair his ability to afford the Georgia Ports Authority proper representation; no such claim is made in this case. Respondent's argument—that Glenn's law partners cannot represent petitioner because Glenn cannot—accordingly fails.

At oral argument, the assistant attorney general presenting respondent's case suggested that we should find the court-appointed attorneys disqualified because they have a financial interest in Glenn's relationship with the attorney general; she suggested that we should assume that in an effort to protect that interest, the court-appointed attorneys may be reluctant to represent petitioner with full vigor. The inference we are to draw from this suggestion is that the court-appointed attorneys

(1) the lawyer reasonably believes the representation will not be adversely affected; and
(2) the client consents after consultation. When representation of multiple clients in a

single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

are fearful that the attorney general may terminate Glenn's appointment if they prevail in this case.

We accept the fact that Mundell and Panzitta are fully aware that they are at complete odds with the attorney general in this case; a compromise settlement is out of the picture. Nonetheless, we reject the notion that counsel might give petitioner less than their best effort in order to protect the income Glenn generates for their law firm.

As noted, Glenn is paid sixty dollars an hour for the work he does for the Georgia Ports Authority. During the period July 1, 1986 to May 31, 1987, Glenn, and thus Hunter–Maclean, received $29,333.70 for services he performed. At first blush, one might conclude that the incentive to protect this source of fees might cause Mundell and Panzitta to limit materially the quality of their representation of petitioner. In light of what it costs Hunter–Maclean to service the Authority account, however, we think the conclusion is unwarranted.

Hunter–Maclean is a large, highly respected law firm, with a broad base of clients. Martindale–Hubbell states that the firm is engaged in "General Civil Practice. Corporate, Admiralty, Probate, Insurance, Labor Relations, Tax, Real Estate, Environmental and Equal Opportunity Law." We take judicial notice of the fees customarily charged by Savannah lawyers who perform the kinds of services provided by the lawyers at Hunter–Maclean, and we conclude that the sixty dollars per hour rate the Authority pays for Glenn's services is far below the "going rate." Consideration must be given to the opportunity cost the firm incurs because Glenn represents the Authority. This cost is the additional profit the firm would earn (1) if Glenn spent his time representing better-paying clients, and (2) if the firm were not fore-

closed, under principles of ethics, from representing parties transacting business with the Authority. Given this economic reality, it is highly unlikely that Mundell and Panzitta will have the retention of the Authority's business in mind as they prosecute the habeas petition in this case.

Before we leave the discussion on this point, we should note that virtually every lawyer who responds to a court's call to represent an indigent faces a financial loss. He may not be paid at all. If he is paid, the amount he receives may be considerably less than what he would have received had he devoted his time and effort to more lucrative work. He accepts the call because it is his bounden duty to do so, as an officer of the court. We recognize that there may be cases in which counsel's financial loss is likely to be so great that his representation of the indigent would be "materially limited," within the meaning of Model Rule 1.7. When that is the situation, counsel should not be appointed. The case at hand, however, is far from such a case.

### B.

The second ground of respondent's motion to disqualify court-appointed counsel is based on Canon 9 of the American Bar Association's Model Code of Professional Responsibility (Model Code), which states that "[a] lawyer should avoid even the appearance of professional impropriety." The Model Code has been replaced by the Model Rules, and thus does not govern the professional conduct of attorneys in the Southern District of Georgia.[11] Under the Model Rules, the appearance of impropriety is not a ground for disqualifying a lawyer from representing a party to a lawsuit.[12] Accordingly, the second ground of respondent's motion is mer-

---

**11.** *See supra* note 9.

**12.** Model Rules 1.10 and 1.11 eliminate the appearance of impropriety approach to disqualification. Prior to the adoption of the Model Rules, several courts had observed that an "appearance of impropriety is simply too slender a

reed on which to rest a disqualification order except in the rarest cases. This is particularly true where ... the appearance of impropriety is not very clear." *Board of Educ. v. Nyquist,* 590 F.2d 1241, 1247 (2d Cir.1979). *See also United States v. Judge,* 625 F.Supp. 901 (D.Haw.1986).

itless.[13]

## III.

For the foregoing reasons, the district court's order denying respondent's motion to disqualify court appointed counsel is

AFFIRMED.

---

**13.** In holding that Canon 9 of the Model Code does not provide a ground for court-appointed counsel's disqualification in this case, we have not overlooked a line of cases in this circuit and our predecessor circuit applying that canon. *See, e.g., Woods v. Covington County Bank,* 537 F.2d 804, 812–19 (5th Cir.1976); *United States v. Hobson,* 672 F.2d 825, 828 (11th Cir.), *cert. denied,* 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982); *Turner v. Orr,* 785 F.2d 1498, 1505–06 (11th Cir.1986). Many of these cases were decided before the Model Rules replaced the Model Code. Of those decided after the replacement, the question of Canon 9's continued vitality was not placed in issue.

Were we to apply the appearance of impropriety standard to the facts of this case, our decision would be the same: court-appointed counsel are not disqualified from representing petitioner. In *Hobson,* we articulated a two-part test for disqualification under the appearance of impropriety standard:

First, although there need not be proof of actual wrongdoing, "there must be at least a reasonable possibility that some specifically identifiable impropriety did occur." Second, "a court must also find that the likelihood of public suspicion or obloquy outweighs the social interest which will be served by a lawyer's continued participation in a particular case."

*Hobson,* 672 F.2d at 828 (citations omitted) (quoting *Woods,* 537 F.2d at 813 & n. 12). In *Norton v. Tallahassee Memorial Hosp.,* 689 F.2d 938, 941 (11th Cir.1982), we held that the first prong of this test requires a showing of "a reasonable possibility that some specifically identifiable impropriety" has, in fact, occurred. There has been no such showing in this case.